UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LEAH RAINES, | CASE NO. 5:12CV653 |
| Plaintiff, | JUDGE PATRICIA A. GAUGHAN |
| v. | Magistrate Judge George J. Limbert |
| CAROLYN W. COLVIN,[1]<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | **REPORT AND RECOMMENDATION**<br>**OF MAGISTRATE JUDGE** |
| Defendant. | |

Leah Raines ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the decision for reevaluation and further analysis of her severe mental health limitations.

**I.** **PROCEDURAL AND FACTUAL HISTORY**

On March 16, 2009, Plaintiff applied for DIB alleging disability beginning December 18, 2008. ECF Dkt. #12 ("Tr.") at 122.[2] Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013 ("DLI"). Tr. at 16. The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 92-93. Plaintiff requested an administrative hearing, and on February 4, 2011, an ALJ conducted an administrative hearing where Plaintiff testified and was

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

represented by counsel. Tr. at 40-91. Plaintiff filed a request for review, which was denied by the Appeals Council on November 23, 2011. Tr. at 1-7.

On March 16, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On August 27, 2012, with leave of the Court, Plaintiff filed a brief on the merits. ECF Dkt. #14. On October 11, 2012, Defendant filed a brief on the merits. ECF Dkt. #15. Plaintiff filed a reply brief on October 25, 2012. ECF Dkt. #16.

**II.**     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from left shoulder rotator cuff tear, degenerative disc disease of the cervical spine, depression, and an anxiety disorder, which qualified as severe impairments under 20 C.F.R. §404.1520(c). Tr. at 16. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525 and 404.1526 ("Listings"). Tr. at 16. The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §404.1567(b), with the abilities to lift and/or carry twenty pounds occasionally and ten pounds frequently, to stand and/or walk for a total of about six hours in an eight-hour workday, and to sit with normal breaks for a total of about six hours in an eight-hour workday, except that she is further limited as follows: (1) no work with ladders, ropes, or scaffolds; (2) she is limited to frequent overhead reaching using the left upper extremity; (3) she must avoid all exposure to hazards, such as machinery and unprotected heights; and (4) she is limited to simple, routine, and repetitive work, where strict time/production pressures are not imposed, in a static environment that involves only brief and superficial contact with coworkers and supervisors. Tr. at 19. He ultimately concluded that, although she could no longer perform her past work as a dispatcher or a customer service representative, there were jobs that existed in significant numbers in the national economy that the claimant could have performed, including that of packager, cafeteria attendant, and office cleaner. Tr. at 24-25. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). When substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001). Thus, the ALJ has a " 'zone of choice' within which he can act without the fear of court interference." *Id.* at 773.

## V. ANALYSIS

Plaintiff advances two arguments in this appeal. First, Plaintiff contends that the ALJ erred when he did not give considerable weight to the opinion of two consulting examining agency physicians, who both concluded that Plaintiff was markedly impaired in her ability to withstand the stress and pressures associated with day-to-day work activity. Second, Plaintiff contends that the ALJ erred in failing to incorporate appropriate limitations in the RFC finding. In essence, Plaintiff asserts the same error in both of her arguments, that is, that the ALJ improperly credited the opinion of a non-examining agency physician despite the fact that the record does not support her conclusions regarding Plaintiff's ability to work.

### A. Medical history

Plaintiff last worked in 2008 as an aide in a residential facility for developmentally-disabled individuals. Tr. at 40, 75, 271. On November 1, 2008, Plaintiff, who was thirty-two years of age at the time, was assaulted by a resident of the facility. The resident shoved Plaintiff into a window and then pulled a key card on a chain around her neck, choking her to the point where she was unable to call for help. Tr. at 285. She was then hit repeatedly in the face and head, but was eventually able to break free and call for help. Tr. at 278, 270, 285.

Plaintiff was treated at Aultman Hospital Emergency Room ("Aultman") for the injury to her face, neck, and left shoulder. Tr. at 270.  She was diagnosed with a contused face and cervical and shoulder strain. Tr. at 271.  Plaintiff went back to the emergency room on December 11, 2008 complaining of  neck and back pain and anxiety.  Tr. at 267.  The attending physician opined that Plaintiff was suffering from anxiety and kept her out of work for a few additional days.  Tr. at 267. Plaintiff visited the emergency room two additional times, on December 18 and December 28, 2008, due to ongoing pain in her back and shoulder. Tr. at 257, 261.  Following an MRI, her physician diagnosed a torn rotator cuff.  Tr. at 257-260. Plaintiff continued to receive treatment for her shoulder injury, which included having an arthroscopy of the left shoulder. Tr. at 492-493.  The ALJ incorporated Plaintiff's physical limitations from her shoulder injury into the RFC, and, insofar as Plaintiff does not assert any error on the part of the ALJ with respect to that portion of the RFC, it appears that Plaintiff only challenges the RFC as it relates to her mental limitations.

Plaintiff asserts that her most serious conditions resulting from the assault relate to her mental health.  Michael Marvin, M.D., a physician at Aultman, diagnosed Plaintiff with post-traumatic stress disorder ("PTSD").  Tr. at 280-286.  Plaintiff told Dr. Marvin that she was suffering anxiety and panic attacks with difficulty breathing. Tr. at 285.  On December 15, 2008, Plaintiff told Kimberly Seth, M.D., another physician at Aultman, that she was working full duty. Tr. at 278.  On December 19, 2008, Dr. Seth noted that Plaintiff was "very emotional during the visit," and she was having nightmares and anxiety about the assault. Tr. at 276.

On January 28, 2009, Plaintiff underwent  a psychological examination by Donald J. Tosi, Ph.D. for her workers' compensation claim.  Tr. at 303.  During the examination, Plaintiff denied prior psychological treatment or conditions and denied any physical or sexual assault as a child.  Tr. at 304.  She denied any legal history and stated that she was an average student with no grade failures or learning or behavioral problems in school.  Tr. at 304.

Dr. Tosi found Plaintiff to be of average intelligence, with adequate reality contact, only mildly reduced concentration and attention, unimpaired comprehension of simple commands, normal stream of thought and flow of ideas, and no educational deficits or cognitive dysfunctions. Tr. at 304. Plaintiff had clear, understandable, relevant, and goal-directed thoughts, reasonably

-5-

well-organized associations, a functional understanding of everyday objects, unimpaired judgment, and normal abstract reasoning, concept formation, and fund of knowledge. Tr. at 304. Plaintiff was a good historian with fair insight and intact and normal executive functions such as decision making, flexibility, and social perceptions. Tr. at 304, 309.

With respect to daily activities, Plaintiff told Dr. Tosi that she performed light housework, washed clothes, cared for a dog, talked to people on the phone, prepared light meals, attended church, cared for her children, read, watched television, grocery shopped, attended school functions, and attended medical appointments. Tr. at 309. Plaintiff cared for her basic personal needs, drove independently, and handled her personal finances. Tr. at 309. She reported the hobby of scrapbooking. Tr. at 309.

Psychological testing indicated that Plaintiff may be indecisive, and may fixate and ruminate on problems. Tr. at 305, 308. The testing suggested poor impulse control, but a normal energy level. Tr. at 305. Dr. Tosi diagnosed adjustment disorder with mixed anxiety and depression, and indicated that the normal recovery period was 3 to 6 months. Tr. at 306. Dr. Tosi suggested that Plaintiff would benefit from brief psychotherapy (ten sessions) over 4 to 5 months. Tr. at 307.

Dr. Kathy Haupt, Plaintiff's primary care physician, completed a Social Security form regarding Plaintiff's mental health on June 22, 2009. Tr. at 414. Dr. Haupt diagnosed major depressive disorder anxiety/panic, due to Plaintiff's ongoing anxiety, dizziness, and fearfulness since her assault. Tr. at 414-415. Dr. Haupt identified Plaintiff's problems as follows:

- Ability to concentrate – unable to focus in a classroom setting. Can't prioritize or sit and read. No goals for the day.

- Ability to think clearly – unable to focus unorganized

- Ability to [communicate] and relate – has sheltered self to immediate family. No trust. Fearful to be in public.

- Ability to follow instructions – ok if familiarity with person giving the instructions d/t trust.

- Ability to take care of personal needs – forgets because of stress and less interest.

- Ability to function independently – lack of motivation affects functionality.

Tr. at 416.

On August 18, 2009, Michael J. Harvan, Ph.D., completed a mental health consultation on behalf of the state Disability Determination Service ("DDS"). Tr. at 435-441. Dr. Harvan noted that Plaintiff reported being sexually abused for five years and that she had been a "horrible student" who "just barely graduated" and repeated American History three times, but who got along with students and teachers. Tr. at 436. She reported attempting to go to career college twice, but losing interest both times. Tr. at 436. Plaintiff reported being fired from several jobs and having trouble dealing with authority, but that she got along with fellow employees. Tr. at 436. Plaintiff reported that she had been arrested in high school for stealing things, in 2005 for using drugs, and a few months before her examination by Dr. Harvan for falsification with intent to commit a theft. Tr. at 436. With respect to mental health treatment, she reported seeing a "Dr. Tulley" since May 2009. Tr. at 437.

Dr. Harvan acknowledged that Plaintiff's speech was normal and she provided a sufficient amount of detail. Tr. at 437. Plaintiff had a moderately depressed mood, but displayed a range of affect and made eye contact about fifty percent of the time. Tr. at 437. Plaintiff reported that her mother called ten to twelve times per day and that she had suicidal thoughts in the past, but not any lately. Tr. at 438. Dr. Harvan observed no motor manifestations of anxiety, such as shaking, fidgeting, or pacing Tr. at 438.

Plaintiff was oriented, had poor long-term memory functioning, fair short-term memory functioning, and difficulty with focusing attention and concentration. Tr. at 439. Plaintiff could follow a simple direction, repeat words and phrases, and mentally solve single digit math. Tr. at 439. Plaintiff also could read a short sentence and solve double digit math except for long division and fractions. Tr. at 438. Dr. Harvan estimated that Plaintiff had intellectual functioning in the low average range and sufficient judgment. Tr. at 439.

Plaintiff reported that she cleaned when she had a spurt of energy and then watched television. Tr. at 439. She also reported talking on the phone a little and reading the newspaper or a book. Tr. at 440. Plaintiff further reported that her hobbies included scrapbooking and taking pictures. Tr. at 440.

Dr. Harvan concluded that Plaintiff's ability to withstand the stresses and pressures associated with day-to-day work activity was markedly impaired, but her abilities to understand and follow instructions, maintain attention to perform simple or multi-step repetitive tasks, and relate to others, were only moderately impaired. Tr. at 440. Dr. Harvan diagnosed PTSD, dysthymic disorder, sexual abuse of adult, and sexual abuse of child. Plaintiff was assigned a Global Assessment of Functioning ("GAF") score[3] of fifty.[4] Tr. at 440.

DDS's reviewing psychologist Karen Steiger, Ph.D. completed a mental residual functional capacity on September 3, 2009, and found that Plaintiff was moderately limited in the majority of categories of Plaintiff's work abilities. Tr. at 442-445. Dr. Steiger diagnosed Plaintiff with affective disorders, anxiety-related disorders, dysthymic disorder, and PTSD. Tr. 446-456. Dr. Steiger further found that Plaintiff was only mildly limited in her activities of daily living, moderately limited in her social functioning and in her concentration, persistence, or pace. Tr. at 456. Dr. Steiger noted inconsistencies in Plaintiff's statements, for example in the August 2009 consultative examination Plaintiff reported sexual abuse, but she denied sexual abuse at the November 2008 examination. Tr. at 444. Likewise Plaintiff reported school difficulties in August 2009, but denied them in November 2008. Tr. at 444. Finally, Plaintiff denied a legal history at the November 2008 examination, but reported legal difficulties in the August 2009 examination. Tr. at 444. As a result of the numerous inconsistencies, Dr. Steiger found Plaintiff partially credible at most. Tr. at 444.

Dr. Steiger reviewed the record opinion evidence. Tr. at 444-45. However, she declined to consider Dr. Haupt's statement, because she found that it was vague regarding functioning. Tr. at 445. Dr. Steiger disagreed with Dr. Harvan's assessment of marked impairment in handling work stress, noting that Plaintiff had no history of psychological hospitalizations, a positive work history,

---

[3] A GAF score is based upon a numeric scale (zero through one-hundred) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living.

[4] A GAF score of forty-one to fifty indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

-8-

adequate activities of daily living, and no problem with the agency field office. Tr. at 444. Moreover, Plaintiff had been cooperative with Dr. Harvan. Tr. at 444. Ultimately, Dr. Steiger concluded that Plaintiff maintained the ability to do simple and routine tasks and would do best in a non-public work setting with occasional and superficial interaction with coworkers and supervisors and no strict production quotas or demands. Tr. at 445.

In September of 2009, Plaintiff sought treatment with Dr. Patel for her mental problems. Tr. at 532. At an appointment on September 15, 2009, Dr. Patel noted Plaintiff's depressed mood, spontaneous behavior, and her memory issues, which included an inability to concentrate, poor recent memory, poor remote memory, and "[decreased] focus." Tr. at 532-535. Dr. Patel diagnosed adjustment disorder with mixed emotions, post traumatic stress disorder, and major depressive disorder. Tr. 537. He assessed a GAF of forty-five. Tr. at 537.

Dr. Patel wrote a letter, dated September 16, 2009, describing Plaintiff's initial appointment. He noted she no longer pursues her former activities and had a recent suicidal ideation and plan. Tr. at 634. Plaintiff saw Dr. Patel for a second time on September 29, 2009, where he documented her inability to focus or pay attention, and continued to diagnose her as having depression and anxiety. Tr. at 538. On October 19, 2009, Plaintiff returned to Dr. Patel, where he noted her to be a "little better" but "still unable to focus" and also recognized her conditions affecting her ability to sleep. Tr. at 540. Plaintiff continued to receive treatment from Dr. Patel's office. Tr. at 541-542. On December 16, 2009, Dr. Patel diagnosed Plaintiff with major depression and PTSD. Tr. at 529. He described her as exhibiting symptoms of major depression with anxiety attacks, "depressed mind," "constant fear" and "cannot do day to day activities." Tr. at 529. Dr. Patel described her limitations as follows: "Patient continues to remain depressed, anxious," "activities limited ...worries a lot and loss of confidence," and "feels she will not get better. Suffers from chronic pain and cannot accept her limitations. Patient is very fearful." Tr. at 530. At Plaintiff's appointment with Dr. Patel on January 13, 2010, Dr. Patel noted anxiety with obsessive thoughts, and that she was having difficulty sleeping. Tr. at 801.

On January 20, 2010, state agency psychologist Steven Meyer, Ph.D., reviewed the record, acknowledging that Plaintiff claimed that her conditions had worsened, and reaffirmed the decision of Dr. Steiger that Plaintiff was not disabled. Tr. at 785.

On February 3, 2010, Dr. Patel found Plaintiff to have an anxious and depressed mood, and he noted her continued panic attacks.  Tr. at 799.  On March 4, 2010, Dr. Patel's office notes document heightened anxiety as Plaintiff could not relax, but that Plaintiff was not suicidal and had fair personal care. Tr. at 797. On March 31, 2010, Plaintiff was still anxious and sad, but not as negative. Tr. at 795. On May 12, 2010, a counselor noted that Plaintiff was "having a child on Monday" and Plaintiff discussed the difficulties of blending her family with the family of her second husband.  Tr. at 849.

Plaintiff had a consultative examination with James Lyall, Ph.D., on February 15, 2010. Tr. at 787.  Plaintiff told Dr. Lyall that she had been molested as a child. Tr. at 787. Plaintiff reported that she had not been a good student, had been arrested for tampering with drugs, and had been arrested in February 2009 for falsifying a police report when "she was trying to run a scheme to collect money from an insurance company." Tr. at 787-88. Plaintiff reported that she was on probation. Tr. at 788. Dr. Lyall noted that Plaintiff stayed inside her house, she needed to be reminded to bathe, and that she has frequent thoughts and dreams about the assault. Tr. at 789.  Dr. Lyall diagnosed Plaintiff with posttraumatic stress disorder, dysthymic disorder, and gave her a GAF of fifty. Tr. at 289-790. Dr. Lyall found Plaintiff markedly impaired in her ability to relate to others, and in her ability to withstand the stress and pressure associated with day-to-day work activity. Tr. at 790. He also found her moderately impaired in her ability to understand and follow instructions, and in her ability to maintain attention and perform simple repetitive tasks. Tr. at 790.

On March 4, 2010, Dr. Patel noted an increase in her anxiety level and that she could not relax or focus. Tr. at 797. On March 31, 2010, Dr. Patel noted that Plaintiff was still anxious and sad. Tr. at 795. On April 31, 2010 Dr. Patel acknowledged that Plaintiff was anxious, tearful, and with a "fearful look on her face." Tr. at 794.  His medical notes indicate that Plaintiff had a kitchen fire, where she would not have called the police because "[she] didn't want strangers in [her] house."

Tr. at 794. On April 28, 2010, his office noted problems regarding poor focus and concentration, panic and fear being outside, panic attacks, and her concerns about her safety. Tr. at 793.

Plaintiff continued to receive treatment from Dr. Patel's office, where her increased anxiety and panic attacks were noted. Tr. at 808-811, 814-815, 817-818, 820-822. Plaintiff had a follow up appointment with Dr. Patel on May 27, 2010 where he noted that her panic attacks were off and on, and that in a public place she gets "worked up." Tr. at 822. Plaintiff visited Dr. Patel on July 15, 2010 where he noted Plaintiff to be somewhat anxious and depressed, and mildly impaired in her concentration and attention. Tr. at 819. She returned on August 9, 2010 where she was found to be anxious, tense, and her concentration and attention were noted to be impaired. Tr. at 816. On October 12, 2010, Plaintiff had a follow up appointment withe Dr. Patel. Tr. at 812. He noted her to be worried, anxious, and unable to focus. Tr. at 812. He also found her concentration and attention were impaired. Tr. at 812.

Plaintiff began treatment with Ikem Nkanginleme, M.D., on November 30, 2010. Tr. at 831. Dr. Nkanginleme noted Plaintiff's focus problem, increased depression, panic issue, and agoraphobia. Tr. at 831. Dr. Nkanginleme also noted her past sexual abuse. Tr. at 833. Upon examination, Dr. Nkanginleme found Plaintiff's judgment to be poor, her coping ability to be overwhelmed, and that, although she gets support from family, her impulse control was minimal. Tr. at 832-833. Plaintiff was diagnosed with a bipolar disorder, panic disorder with agoraphobia, adjustment disorder, PTSD, and other additional conditions. Tr. at 833. Plaintiff was originally assessed a GAF of sixty but notes handwritten by Dr. Nkanginleme assessed a GAF score of fifty. Tr. at 831, 833.

Plaintiff followed up with Dr. Nkanginleme at New Horizons on December 8 and 10, 2010, where she was found to be unstable. Tr. at 827-830. Plaintiff had a follow up appointment with Dr. Patel on December 28, 2010 and his examination found her agitated and depressed, having crying spells from which she was not able to calm down. Tr. at 806. Dr. Patel noted her concentration and attention were mildly impaired. He then concluded, "Patient continues to remain anxious and depressed at [sic] limited as far as her day to day functioning. She is not able to cope or concentrate. She has difficulty being independent and relies on her father to help her." Tr. at 806. Plaintiff

-11-

returned to Dr. Nkanginleme on December 30, 2010, where a death in her family was noted and that she had cried for most of the morning. Tr. at 825. She was diagnosed with bipolar disorder, agoraphobia, adjustment disorder, PTSD, and additional conditions. Tr. at 825-826.

### B.     Plaintiff's testimony at the hearing

At the hearing, Plaintiff testified that she was divorcing her second husband, who she married in December of 2007 and separated from in June of 2008. Tr. at 38. At the time of the hearing, Plaintiff had three children ranging in age from fourteen years to eighteen and a half months. Tr. at 46. She testified that she was subject to ongoing physical abuse during her first marriage. Tr. at 51. According to Plaintiff, she suffers memory problems and concentration problems. Tr. at 55-56. Plaintiff's father maintains a calendar in her kitchen that lists her doctors' appointments. Tr. at 60. Plaintiff contends that if her father did not maintain the calendar she would miss her appointments. Plaintiff further testified that her father comes to her home everyday, he cooks dinner, helps her children with their homework, and pays Plaintiff's bills. Plaintiff conceded that she has been fired from every job she has ever had. Tr. at 71-74.

At the hearing, the ALJ recounted his own assault in his home in January of 2010. Tr. at 44. The ALJ explained that he was struck with a bottle from behind after going downstairs to investigate a noise. He was in the hospital for a month with three broken bones under his eye, and he had to undergo facial reconstruction surgery. The ALJ explained that he was able to return to his residence because "little by little, step by step, in that at first I went [home] with someone. And the first time [he] spent the night at [his] house he was petrified. [He] slept with all of the doors locked, with all of the lights on. But after making [himself] do that for about six months, now [he] is okay being there." The ALJ also recounted his experiences with victims of violent crimes when he was a district attorney. Tr. at 44- 45. The ALJ repeatedly chastised Plaintiff for dwelling on the negative aspects of her life, rather than focusing on the positive aspects. Tr. at 45. He encouraged her to go the mall (she does not like crowds), call friends, and rent happy movies. Tr. at 48. Plaintiff informed the ALJ that her father had sold his car and taken over the payments on her car (which she could no longer afford and was worth less than she owes), and that she now has no transportation.

The ALJ responded, "But have you noticed what's going on here?  Every question I asked is designed to elicit a happy response. And no matter how happy the question may start off, you turn it right back around and come to something extremely, or extraordinarily negative." Tr. at 48.  The ALJ encouraged Plaintiff to start having fun at home, and then branch out and "start having fun otherwise." Tr. at 50.  Plaintiff stated that she "would be so embarrassed for someone to see [her] like this, though." Tr. at 50.  The ALJ responded, "But you look like a normal person. It's not like you have two heads, so there's no reason to be embarrassed."  Tr. at 50.

### C.     The ALJ's decision

The ALJ rejected the conclusions of Dr. Harvan and Dr. Lyall, that is, that Plaintiff was markedly limited in her ability to withstand ordinary stresses and pressures associated with day-to-day work activity.  He also rejected Dr. Lyall's conclusion that Plaintiff was markedly limited in her ability to relate to others.  The ALJ predicated his decision on Plaintiff's inconsistent statements regarding her childhood and adolescence.  In other words, to the extent that Plaintiff provided incredibly varied accounts of her life to the consulting examining physicians, the ALJ concluded that opinions based upon those accounts should not be credited.  The ALJ also predicated his decision to reject the opinions of the examining physicians because they were inconsistent with the medical evidence as a whole.  The ALJ again cited the inconsistent history provided by Plaintiff to the various examining physicians.  He also wrote, "[Plaintiff] can adequately perform her daily activities; is obviously able to attend quite regularly and frequently her medical, psychiatric and psychotherapy appointments; and has not had any intervention treatment, such as psychiatric hospitalizations, that would warrant any market limitations." Tr. at 23.

The ALJ credited the opinions of Dr. Steiger and Dr. Meyer, who found no more than moderate limitations and who disagreed with the conclusion of Dr. Harvan for the same reasons as the ALJ.  The ALJ wrote, "Dr. Steiger found the claimant's mental impairments do not restrict her from performing simple and routine tasks in a non-public work setting with occasional and superficial interaction with coworkers and supervisors and with no strict production quotas.  This opinion is much more consistent with the claimant's demonstrated abilities to leave her home on a

-13-

frequent basis, cooperate with her treating and examining sources, and maintain attention and concentration during her counseling sessions." Tr. at 24.

With respect to the medical source statement prepared by Plaintiff's treating physician, Dr. Haupt, the ALJ cited Dr. Steiger's opinion that Dr. Haupt's observations were too vague to be accorded any real weight. Tr. at 24. The ALJ concluded that "[g]iven all the factors analyzed in this case, the preponderance of the evidence supports a finding that the claimant can perform a light range of exertional work with additional limitations." Tr. at 24.

### D.     Lack of Substantial Evidence

Plaintiff challenges the ALJ's reasons for rejecting the opinions of Dr. Harvan and Dr. Lyall. The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96–6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. See id. at *2 -3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. See 20 C.F.R. § 404.1572(f); see also Ruling 96–6p at *2-3.

First, the ALJ rejected the opinions of Drs. Harvan and Lyall because Plaintiff failed to disclose her history of abuse, as well as her problems in school and her criminal history, to Dr. Tosi. Plaintiff contends that her history of abuse is irrelevant to the determinations made by Drs. Harvan and Lyall, because her disability claim is predicated upon the physical assault on November 1, 2008. In other words, the opinions of Drs. Harvan and Lyall are based upon an analysis of the effects of Plaintiff's PTSD resulting from the November 2008 attack. Furthermore, Plaintiff contends that, although she did not divulge her previous abuse to Dr. Tosi, he nonetheless concluded that she was "so nervous that she has trouble dealing with everyday stress, pressure and demands," and found her impulse control was poor. Tr. at 305.

-14-

Next, the ALJ concluded that Plaintiff is capable of performing activities of daily living. Plaintiff asserts that the record reflects that she obsessively cleans, Tr. at 789, she cannot manage her own money, Tr. at 66, and she cannot take her children to school, to church, or to extra-curricular activities. Tr. at 51, 61.  The record reflects that she is afraid of her neighbors, Tr. at 64, and that her father must pull in the garage when he picks her up for doctor's appointments because she refuses to walk out the front door to the driveway.  Tr. at 63.  He father makes dinner for her children almost every night and helps them with their homework.  Tr. at 61.

Third, the ALJ relied upon Plaintiff's ability to attend her doctor's appointments to conclude that she is able to perform full time employment.  Plaintiff argues that her ability to attend doctor's appointments, which are brief and scheduled weeks apart, does support the ALJ's conclusion that she is capable of full-time work.  Fourth, the ALJ relied upon the fact that Plaintiff had not been hospitalized due to her anxiety and PTSD to conclude that she could perform full-time work. Plaintiff contends that hospitalization is not necessary in order to demonstrate an inability to work.

Finally, Plaintiff argues that the ALJ acted inappropriately at the hearing.  Plaintiff argues that the ALJ's personal feelings about Plaintiff's mental problems, which he displayed on several occasions during the hearing, influenced his decision.  Plaintiff asserted the same argument at the administrative level, where the Appeals Council referred her claim to "another component [of the Appeals Council] to separately review, investigate and take any internal action(s) it deems appropriate."  Tr. at 2.

As previously stated, the ALJ's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* supra. Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a judgment as a matter of law if this case were being tried to a jury.  *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir.1988) (citing *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)).

While it is clear from the record that Plaintiff was either guilty of withholding portions of her history during the early stages of her claim, or manufacturing them in the later stages, the undersigned recommends that the case be remanded for further factfinding with respect to Plaintiff's

-15-

mental impairments.  First, Plaintiff correctly argues that the ALJ appeared to abandon his impartial role when he began actively counseling and then criticizing Plaintiff about her efforts to overcome her anxiety and PTSD.  While the ALJ's behavior at the hearing alone might not require the Court to reverse his decision, his behavior coupled with his reliance on Dr. Steiger's opinion favors remand.  Dr. Steiger's opinion was directly contradicted by two consulting examining physicians.  Moreover, the ALJ completely rejected the opinion of Plaintiff's treating physician, Dr. Haupt, because Dr. Steiger characterized Dr. Haupt's assessment as too vague.  Of equal concern,  Dr. Steiger formulated her opinion prior to Plaintiff's mental health treatment by Drs. Patel and Nkanginleme, and, as a consequence, she did not have the benefit or reviewing their office notes, which contradict her conclusions.  Finally, the ALJ found that Plaintiff is able to perform her daily activities of living because she is able "to attend quite regularly and frequently her medical, psychiatric and psychotherapy appointments; and has not had intervention treatment, such as psychiatric hospitalizations."  Tr. at 23.  Simply stated, the ALJ's disability determination was predicated upon his disbelief of Plaintiff's claims (despite ample evidence of her mental problems in the record) and her ability to regularly attend her medical appointments.  Such evidence falls short of the evidentiary requirement of substantial evidence.

## VI.   CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the decision for reevaluation and further analysis of Plaintiff's severe mental impairments.

DATE: February 22, 2013

                                         */s/George J. Limbert*
                                         GEORGE J. LIMBERT
                                         UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).